UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF )<br>GORDON E. PARRY, JR., as Owner of )<br>2003 Chaparral Signature 280 cabin cruiser, )<br>MS-2594-AJ, HIN-FGBA0331F203, )<br>For Exoneration from or Limitation of )<br>Liability. ) | CIVIL ACTION<br>NO.: 15-10686-LTS |

**PLAINTIFF'S RESPONSE TO CLAIMANT/THIRD-PARTY DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S OWN STATEMENT OF MATERIAL OF FACTS**

Now comes Plaintiff, Gordon E. Parry, Jr., by and through his attorneys to submit his responses to Claimant/Third-Party Defendant, 3A Marine Service, Inc.'s ("3A Marine") Statement of Material Facts and to add his Statement of Undisputed Material Facts in support of his Opposition to 3A Marine's Motion for Summary Judgment.

**RESPONSES TO 3A MARINE STATEMENT OF FACTS**

1. Admit.

2. Admit.

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. Qualified. After July 25, 2014 Parry never complained to 3A Marine of any issue concerning either the smell of gasoline onboard the Vessel or the Vessel's engines running roughly or improperly. He did complain on July 25, 2014 to 3A Marine that he smelled gasoline. This was his second time smelling gasoline. See ¶¶32-40 below.

8. Admit.

9. Admit.

10. Admit.

11. Admit.

12. Admit.

13. Admit.

14. Admit.

15. Admit.

16. Admit.

17. Admit.

18. Admit.

19. Admit.

20. Qualified. Plaintiff's expert said much more than what Claimant set forth. *See* ¶¶ 57–62 below.

21. Qualified. Plaintiff's expert did testify that the leak occurred in the high pressure fuel system. *See* ¶¶ 62–63 below.

22. Admit.

**PLAINTIFF'S ADDITIONAL STATEMENT OF UNDISPUTED MATERIAL FACTS**

23. From the fall of 2007 to August 24, 2014, 3A Marine maintained and repaired Plaintiff's vessel as well as provided winter storage for the vessel at a cost of over $41,500.00. *See* page 49–50 of Plaintiff's deposition attached hereto as Exhibit A. *See* Exhibit F attached hereto.

24. 3A Marine would make decisions concerning replacement of engine filters, "[b]ecause they pretty much would do the mechanical work on the boat." *See* p. 112–113 of Plaintiff's deposition attached hereto as Exhibit A.

25. Patrick Desmond of 3A Marine was the point person responsible for the Plaintiff. *See* p. 21–22 of 30(b)(6) Deposition of 3A Marine Service, Inc. by and through Patrick J. Desmond attached hereto as Exhibit B.

26. "As Pat [of 3A Marine] said to [Plaintiff] one time, he said, you stick to the accounting, I'll stick with your boat maintenance." *See* p. 113 of Plaintiff's deposition attached hereto as Exhibit A.

27. Patrick Desmond testified that he was aware that the Plaintiff "was relying upon 3A to ensure that his vessel was operating correctly and was safe to take out on his recreational voyages." *See* p. 75–76 of 30(b)(6) Deposition of 3A Marine Service, Inc. by and through Patrick J. Desmond attached hereto as Exhibit B.

28. At the 30(b)(6) Deposition of 3A Marine Service, Inc. by and through Patrick J. Desmond the following testimony occurred:

> Q. Would you agree with me that there was never a situation where Mr. Parry took a stab at repairing something himself, incorrectly repaired it, and then took it to you to have it repaired? And by "you" I mean 3A.
>
> A. Not to my knowledge.
>
> Q. Is it safe to say that he relied upon 3A to diagnose issues and repair them?
>
> A. Yes.
>
> Q. He wasn't a do-it-yourselfer?
>
> A. Yes.

*See* p. 118–119 of 30(b)(6) Deposition of 3A Marine Service, Inc. by and through Patrick J. Desmond attached hereto as Exhibit B.

29. Plaintiff utilized 3A Marine to service his Volvo Penta engine because 3A Marine had Volvo Penta certified mechanics and were highly recommended. *See* p. 70–71 of Plaintiff's deposition attached hereto as Exhibit A.

30. While the Plaintiff did know how to open the hatch cover to the engine compartment he did not perform any maintenance on the vessel. *See* p. 63–64 of Plaintiff's deposition attached hereto as Exhibit A.

31. 3A Marine was not in the habit of demonstrating to the Plaintiff how to do maintenance on the vessel's engine. *See* p. 83 of Plaintiff's deposition attached hereto as Exhibit A.

32. In fact, 3A Marine even traveled to Provincetown to service the Plaintiff's vessel. *See* p. 99–101 of Plaintiff's deposition attached hereto as Exhibit A.

33. On or about July 7, 2012, 3A Marine identified an issue with the port engine fuel pump, 3A Marine replaced the port engine fuel pump, and conducted a test and a water test to confirm proper operation. *See* p. 94–97 of Plaintiff's deposition attached hereto as Exhibit A.

34. On July 3, 2014, Plaintiff noticed a gasoline odor on his vessel when he brought the vessel into the gas dock. *See* p. 134–138 of Plaintiff's deposition attached hereto as Exhibit A.

35. On July 6 or 7, 2014, Plaintiff brought vessel to 3A Marine to inspect the fuel leak as well as some other issues. *See* p. 138-141 of Plaintiff's deposition attached hereto as Exhibit A.

36. Pat of 3A Marine told Plaintiff "[Gordon], I inspected the whole fuel system and didn't find anything wrong with it and didn't see anything wrong." *See* p. 141 of Plaintiff's deposition attached hereto as Exhibit A.

37. On July 25, 2014, Plaintiff filled his vessel with fuel. *See* p. 130–134, 144–145 of Plaintiff's deposition attached hereto as Exhibit A.

38. On July 25, 2014, Plaintiff brought the vessel to 3A Marine. *See* p. 145–146 of Plaintiff's deposition attached hereto as Exhibit A.

39. On July 25, 2014, Pat of 3A Marine "inspected the fuel system, and he discovered that there was a conclave in the gas tank." *See* p. 146 of Plaintiff's deposition attached hereto as Exhibit A.

40. On July 25, 2014, after Pat of 3A Marine made repairs, Plaintiff asked if the boat was safe to use and Pat said yes. *See* p. 146–147 of Plaintiff's deposition attached hereto as Exhibit A.

41. Between July 25, 2014 and the day the vessel exploded, Plaintiff made two or three trips to Provincetown.

42. On July 25, 2014 after fueling the vessels he noticed a gas odor in the cabin of the vessel. *See* p. 134 of Plaintiff's deposition attached hereto as Exhibit A.

43. On August 15, 2014, Plaintiff took the vessel to Provincetown where he stayed on a mooring until August 17, 2014, later departing by ferry to Boston leaving the vessel on a mooring in Provincetown. *See* p. 174–180 of Plaintiff's deposition attached hereto as Exhibit A.

44. On August 20, 2014, Plaintiff took a ferry from Boston back to Provincetown and boarded his vessel on the mooring. *Id.*

45. On August 23, 2014, Plaintiff ran the vessel's engines thirty minutes to charge the vessel's batteries. *See* p. 185–186 of Plaintiff's deposition attached hereto as Exhibit A.

46. On August 23, 2014, Mr. Lundmark arrived at the vessel and stayed the night. *See* p. 184 of Plaintiff's deposition attached hereto as Exhibit A.

47. On August 24, 2014, Plaintiff made the vessel ready to get underway. *See* p. 188–189 of Plaintiff's deposition attached hereto as Exhibit A.

48. On August 24, 2014, Plaintiff started the engines, but the port engine backfired but eventually started up. *See* p. 200–201 of Plaintiff's deposition attached hereto as Exhibit A.

49. Shortly after letting go of the mooring lines, the port engine stopped and Plaintiff was able to restart the engine. *See* p. 207–208 of Plaintiff's deposition attached hereto as Exhibit A.

50. As the vessel was outside of the mooring area, Plaintiff heard a lot of yelling and a lot of bangs. *See* p. 209 of Plaintiff's deposition attached hereto as Exhibit A.

51. Massachusetts Environmental Police Officer John Girvalakis was the first person to inspect the vessel. At that inspection he took photographs of the high pressure fuel system on the port engine. *See* p. 98–101 and Exhibit 4 of the Deposition of John Girvalakis attached hereto as Exhibit D.

52. Officer Girvalakis testified that he found a fuel fitting turned at a different angle than the other fuel fittings. *See* 104–106, 108–111 and Exhibit 4 of the Deposition of John Girvalakis attached hereto as Exhibit D.

53. Officer Girvalakis testified:

    Q. Sure. Well, let me ask you this way –

    A. Sure.

    Q. — when you write 'I cannot rule out the possibility of a maintenance mishap at this time,' what do you mean?

    A. I mean boats just don't spontaneously explode.

    Q. Sure.

    A. So, in order for a boat to explode, you have to have some type of—you have to have fuel, you have to have heat, you have to have oxygen, and in this case, you had to have some type

of an explosive atmosphere in the rate mixture, ration between fuel vapors and/or oxygen. It's a balance.

If you have too rich an environment, you don't have combustion. If you have too lean an environment, you don't have combustion.

What I'm saying is there was some type of a fuel issue in here in which they had an explosive environment created which ultimately caused the explosion and fire.

Whether that's some type of maintenance issue, you know, maintain the boat, working on the boat, changing filters on the boat, something to do with the fuel system on the boat, I can't be certain, and I can't direct you to a specific cause because the nature of the fire was so intense that a lot of items burned, and heat significantly can distort things.

And like I said, heat is the best type of wrench you can get. It will loosen up all types of stuff.

That's not to say that a fitting was put on incorrectly or something was put on incorrectly to allow that to escape. Certainly that could be the case as well. I can't give you a definitive answer.

*See* 132–133 and Exhibit 4 of the Deposition of John Girvalakis attached hereto as Exhibit D.

54. Officer Giravalakis goes on to testify regarding his report and the cause of the fire was:

Q. And at that point, the only one that you list here that you couldn't rule out was a maintenance mishap, you'll agree with me?

A. Correct. And perhaps there's something that I overlooked but I don't recall. I don't think so. *See* 201-205 and Exhibit 4 of the Deposition of John Girvalakis attached hereto as Exhibit D.

55. Lundmark's expert disclosure states in relevant part:

It is this investigator's opinion that the loose fitting at the fuel pump of the port engine resulted in a gasoline vapor cloud ignition within the engine compartment of the vessel. *See* Exhibit E attached hereto.

56. Plaintiff's expert Steven Sundquist issued a report concerning the loss of the vessel. *See* p. 37 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

57. Mr. Sundquist observed that "[t]he fuel lines for both engines from the pumps to the fuel rail were heavily damaged and were not complete on either engine, with the lines being missing or partially consumed in the fire." *See* p. 53–54 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

58. Mr. Sundquist testified that "[t]he area of the origin and explosion of the fire was the engine compartment. *See* p. 98 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

59. Mr. Sundquist based that opinion on the harbormaster's video depicting the explosion and the fire patterns he observed in October of 2014, and witness statements. *See* 98–99 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

60. Mr. Sundquist testified that the fuel that accumulated within the vessel's engine space was "clearly coming from the engine, the pressurized fuel from the engine. Because you would not develop the visual smoke that you saw in the video if it didn't—if it was coming from anywhere else. There was no other fuel in that vessel capable of producing that level of smoke and black…." *See* 132–133 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

61. Mr. Sundquist testified that "the cause of the explosion and subsequent fire is the ignition of the gasoline vapors that were present in the engine compartment." *See* 136–137 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

62. He further testified that the "there was enough vapor generation, and the only place for it to come from, is the engine fuel system." *See* 140–141 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

63. Sundquist further stated that "[t]here's a substantial amount of fuel based on the smoke pattern I saw in the Harbormaster's video …

   I cannot say specifically where the leak was, but the amount of fuel that was there was substantial. Would it make sense that it came out of the high pressure line, yes. That's where you are going to get the most fuel.

   Actually, a high pressure line if you have a small crack or a loose fitting and under pressure, you can atomize that gasoline as it's coming out and make it more of a vapor, make it more susceptible to explosion…." *See* p. 182–184 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

64. Mr. Sundquist report indicates that "[t]he port engine exhibited the high pressure fuel line fitting from the engine's fuel pump disconnected at the pump." *See* p. 47–48 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

65. Mr. Sundquist testified that the he understood that the fixture was previously manipulated by Sargent John Girvalakis. *See* p. 49 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

66. On page 10 of Sundquist's report, the top photograph, the line that appears to not have been removed from the pump is the return. *See* p. 192 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

67. On page 10 of Sundquist's report, the "line that has been removed from the pump, is the supply line. *See* p. 192 and Exhibit 4 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

68. The torque rating for the fitting in question was 12 to 15 pounds of torque. *See* p. 204–205 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

69. The torque rating is designed to create enough resistance to twisting to overcome the effect of the vibration of the engine for the life of its expected operation for the application that it is installed. *See* p. 210–211 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

70. With respect to the fitting that was loose, Mr. Sundquist testified "[i]t's a fitting that comes loose where it's not supposed to come loose, is an indication that—that it may not have been torqued correctly or there's—it may have been torqued correctly and the torque measurement is incorrect because of the deformities, contamination and so forth within the threaded connection." *See* p. 248–249 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

71. Mr. Sundquist was asked the following:

Q. The intensity of the fire, could it have caused that—the hexagonal shape fuel fitting on the high pressure side on the port engine, could have caused the loosening of the fitting?

A. What I would expect with that, if it loosened that one, it would have loosened both of them. Because they are in the same —

Q. But it could have done one correct?

A. I don't know how heat would affect one and not the other.

*See* p. 249 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

72. The fuel system operates in a loop. After the fuel leaves the fuel pump pressurized it travels "to fuel injectors through the distribution rail and then back to the pump itself." *See* p. 167 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

73. The pressure on the "discharge side of the fuel pump is 50 to 60 psi." *See* p. 171 of the Deposition of Steven Sundquist attached hereto as Exhibit C.

Respectfully submitted

/s/ David S. Smith
_____
David S. Smith, Esq.
BBO No.: 634865
Farrell & Smith, LLP
60 Washington St., Suite 303
Salem, MA 01970
978-744-8918
dsmith@FarrellSmith.com

CERTIFICATE OF SERVICE

I, David S. Smith, hereby certify that I caused to have served a copy of the foregoing document upon all parties of record utilizing the ECF system this 14th day of March 2018.

/s/ David S. Smith
David S. Smith