UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN THE MATTER OF                          )
GORDON E. PARRY, JR., as Owner of         )
2003 Chaparral Signature 280 cabin cruiser, )     CIVIL ACTION
MS-2594-AJ, HIN-FGBA0331F203,             )        NO.: 15-10686-LTS
For Exoneration from or Limitation of     )
Liability.                                )

### PLAINTIFF'S OPPOSITION TO CLAIMANT/THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now comes Plaintiff, Gordon E. Parry, Jr. ("Parry"), by and through his attorneys to submit his Memorandum of Law in Opposition to Claimant/Third-Party Defendant, 3A Marine Service, Inc.'s ("3A Marine") Motion for Summary Judgment seeking dismissal of the Plaintiff's First Amended Third-Party Claim.

### PROCEDURAL POSTURE

Parry filed a Petition for Exoneration From or Limitation of Liability.  David Lundmark ("Lundmark") filed a Claim and Answer.  *See* Docket Nos.: 15 and 16.  Parry filed a Reply to Lundmark's Claim and a Third Party Claim against 3A Marine which was later amended.  *See* Docket Nos.: 25 and 38.  3A Marine filed a Claim and Answers.  *See* Docket Nos.: 39 and 40. Plaintiff filed an answer to 3A Marine's claim for contribution and indemnification.  *See* Docket No.: 42.  It should be noted that on August 24, 2017, Lundmark filed a negligence action in Middlesex Superior Court against 3A Marine.  *See Lundmark v. 3A Marine Service, Inc.*, Civil Action No.1781CV02526.

3A Marine's Motion for Summary Judgment does not challenge Plaintiff's right to limit liability.  It only challenges the Third Party Claim which in essence contains some of the same claims that are to be litigated between Lundmark and 3A Marine in the Middlesex Superior

Court.  3A Marine's motion is untimely as Plaintiff's right to limit his liability by statute must be determined first.

## FACTS

On Sunday, August 24, 2014, Parry was the owner and operator of his 2003 Chaparral Signature 280 cabin cruiser ("Vessel") when an explosion and fire occurred onboard the Vessel while it was located within Provincetown Harbor, Massachusetts (the "Incident"). *See ¶ 3 of Claimant/Third-Party Defendant, 3A Marine, Statement of Undisputed Material Facts ("Undisputed Facts").*

From the Fall of 2007 to August 24, 2014, 3A Marine maintained and repaired Plaintiff's Vessel as well as provided winter storage for the Vessel as a cost of over $41,500.00. *See ¶ 23 of Plaintiff's Response to Claimant/Third-Party Defendant's Statement of Undisputed Material Facts and Plaintiff's Own Statement of Material Facts ("Plaintiff's Facts").*

3A Marine would make decisions concerning the replacement of the engine's filters "because they pretty much would do the mechanical work on the boat." *See ¶ 24 of Plaintiff's Facts.*

The Plaintiff's point person from 3A Marine, Patrick Desmond, was responsible for the Plaintiff's Vessel and had said to the Plaintiff at one time, "You stick to the accounting, I'll stick with your boat maintenance." *See ¶¶ 25–26 of Plaintiff's Facts.*

Patrick Desmond testified that he was aware that the Plaintiff "was relying upon 3A to ensure that his vessel was operating correctly and was safe to take out on his recreational voyages," and was also aware that the Plaintiff relied on 3A to diagnose issues and repair them. *See ¶¶ 27–28 of Plaintiff's Facts.*

The Plaintiff utilized 3A Marine to service his Volvo Penta engine because 3A Marine had Volvo Penta certified mechanics who were highly recommended. *See* ¶ 29 of *Plaintiff's Facts.*

3A Marine was not in the habit of demonstrating to Plaintiff how to do maintenance on the Vessel's engine and the Plaintiff admittedly did not perform any maintenance on the Vessel. *See* ¶¶ 30–31 of *Plaintiff's Facts.*

3A Marine, on occasion, would even travel to Provincetown in order to provide service to the Plaintiff's Vessel. *See* ¶ 32 of *Plaintiff's Facts.*

On or about July 7, 2012, 3A Marine identified an issue with the port engine fuel pump, replaced the port engine fuel pump, and conducted multiple tests to confirm proper operation. *See* ¶ 33 of *Plaintiff's Facts.*

On April 29, 2014, the Plaintiff requested to have his Vessel commissioned by 3A Marine, for the 2014 boating season. *See* ¶ 1 of *Undisputed Facts.*

After 3A Marine commissioned Parry's Vessel for the 2014 boating season and before the Incident occurred on August 24, 2014, Parry operated the Vessel on different occasions, including trips between its mooring at the Savin Hill Yacht Club, in Dorchester Massachusetts, and Provincetown, Massachusetts. *See* ¶ 4 of *Undisputed Facts.*

On July 3, 2014, the Plaintiff noticed a gasoline odor on the Vessel when he brought it into the gas dock. *See* ¶ 34 of *Plaintiff's Facts.*

On or about July 6 or 7, 2014, Plaintiff brought the Vessel to 3A Marine so they could inspect the fuel leak and tend to other issues. *See* ¶ 35 of *Plaintiff's Facts.*

At this time, Patrick Desmond told the Plaintiff that he "inspected the whole fuel system and didn't find anything wrong with it and didn't see anything wrong." *See* ¶ 36 of *Plaintiff's Facts.*

On July 25, 2014, the Plaintiff filled the Vessel with fuel and noticed a gas odor in the cabin and brought the Vessel to 3A Marine. *See* ¶¶ 37–38, 42 of *Plaintiff's Facts.*

At this time, Patrick Desmond "inspected the fuel system, and he discovered that there was a conclave in the gas tank," repairs were made to the tank, and the Plaintiff was told that the boat was safe to use. *See* ¶¶ 39–40 of *Plaintiff's Facts.*

Between July 25, 2014 and the day of the Incident, Plaintiff made two or three trips to Provincetown. *See* ¶ 41 of *Plaintiff's Facts.*

The last trip before the Incident, Plaintiff took the Vessel to Provincetown on August 15, 2014 where it remained on a mooring. *See* ¶¶ 43–44 of *Plaintiff's Facts.*

The day before the Incident, on August 23, 2014, Plaintiff operated the Vessel for thirty minutes to charge the Vessel's batteries. *See* ¶ 8 of *Undisputed Facts*; ¶ 45 of *Plaintiff's Facts.*

On this same day, Lundmark arrived at the Vessel and stayed the night. *See* ¶ 46 of *Plaintiff's Facts.*

On August 24, 2014, the day of the incident, the Plaintiff made the vessel ready to get underway. *See* ¶ 47 of *Plaintiff's Facts.*

The Plaintiff then started the engines, however, the port engine backfired before it eventually started up. Shortly after letting go of the mooring lines, the port engine stopped and the Plaintiff restarted it. *See* ¶¶ 48–49 of *Plaintiff's Facts.*

As the Vessel was outside of the mooring area, Plaintiff heard a lot of yelling and a lot of bangs. *See* ¶ 50 of *Plaintiff's Facts.*

Lundmark alleges that he sustained personal injuries as a result of the Incident. *See* ¶ 10 of *Undisputed Facts.*

On October 14, 2014, fire cause and origin investigators conducted a joint inspection of the Vessel's wreck while stored at Bay Sails Marine in Wellfleet, Massachusetts. The investigators included: Steven Sundquist ("Sundquist"), representing Parry's interests; Michael Higgins ("Higgins"), representing 3A Marine's interests; Michael Hennessy ("Hennessy"), representing Lundmark's interests; and Sergeant John Girvalakis ("Girvalakis"), an investigator from the Massachusetts Environmental Police. *See* ¶ 11 of *Undisputed Facts.*

Girvalakis was the first person to inspect the Vessel. At this inspection, he took photographs of the high pressure fuel system on the port engine. *See* ¶ 51 of *Plaintiff's Facts.*

Girvalakis testified that, during his inspection, he found a fuel fitting turned at a different angle than the other fittings and that based on his inspection of the Vessel remains, the only cause that he could not rule out, was a maintenance mishap. *See* ¶¶ 52–54 of *Plaintiff's Facts*; ¶ 18 of *Undisputed Facts.*

Lundmark's expert disclosure stated his opinion as to the cause of the Incident as the loose fitting at the fuel pump of the port engine which resulted in a gasoline vapor cloud ignition within the engine compartment of the vessel. *See* ¶ 55 of *Plaintiff's Facts.*

Plaintiff's expert, Sundquist, issued a report concerning the loss of the Vessel where he observed that "[t]he fuel lines for both engines from the pumps to the fuel rail were heavily damaged and were not complete on either engine, with the lines being missing or partially consumed in the fire." *See* ¶¶ 56 and 57 of *Plaintiff's Facts.*

Sundquist testified that "[t]he area of the origin and explosion of the fire was the engine compartment. He states the basis of his opinion on the harbormaster's video depicting the

explosion and the fire patterns he observed in October of 2014, as well as witness statements. *See* ¶¶ 58 and 59 of *Plaintiff's Facts.*

Sundquist also testifies that the fuel that accumulated within the Vessel's engine space was "clearly coming from the engine, the pressurized fuel from the engine.  Because you would not develop the visual smoke that you saw in the video if it didn't – if it was coming from anywhere else. There was no other fuel in that vessel capable of producing that level of smoke and black. . . ." *See* ¶ 60 of *Plaintiff's Facts.*

Sundquist testified that "the cause of the explosion and subsequent fire is the ignition of the gasoline vapors that were present in the engine compartment." He also states that "there was enough vapor generation, and the only place for it to come from, is the engine fuel system." *See* ¶¶ 61 and 62 of *Plaintiff's Facts.*

Sundquist further states that although he could not specifically state where the leak was, "the amount of fuel that was there was substantial.  Would it make sense that it came out of the high pressure line, yes. That's where you are going to get the most fuel." He further explained how a "small crack or loose fitting" in a high pressure line can "make it more susceptible to explosion." *See* ¶¶ 63 of *Plaintiff's Facts*; ¶ 21 of *Undisputed Facts.*

Sundquist's report indicated that "[t]he port engine exhibited the high pressure fuel line fitting from the engine's fuel pump disconnected at the pump." He testified that he understood that the fixture was previously manipulated by Girvalakis. *See* ¶¶ 64 and 65 of *Plaintiff's Facts.*

Sundquist testified about the loose fitting, saying "[i]t's a fitting that comes loose where it's not supposed to come loose, is an indication that – that it may not have been torqued correctly or there's – it may have been torqued correctly and the torque measurement is incorrect because of the deformities, contamination and so forth within the threaded connection." He also

explains how a torque rating is designed to create enough resistance to twisting to overcome the effect of the vibration of the engine for the life of its expected operation for the application that it is installed. *See ¶¶ 66 - 70 of Plaintiff's Facts.*

Sundquist also stated, when asked about the effect of heat on the fittings, that he would not expect for heat to only effect that fitting and not the other on top of the fuel pump. *See ¶ 71 of Plaintiff's Facts.*

## ARGUMENT

### A.      Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine dispute of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 Led.2d. 265, 106 S.Ct. 2548 (1986).  Then the non-moving party must demonstrate that "*every essential element* of its claim or defense is at least trial worthy." *Price v. General Motors Corp.*, 931 F.2d 162, 164 (1st Cir. 1991)(italics in original).

A dispute is genuine if it "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997).  Facts are "material" if they possess "the capacity to sway the outcome of litigation under the applicable law." *Id.*  The *Cadle* Court said:

> "Establishing a genuine issue of material fact requires more than
> effusive rhetoric and optimistic surmise. If the evidence [adduced in
> opposition to the motion] is merely colorable, or is not significantly
> probative, summary judgment may be granted.  In other words, the
> "evidence illustrating the factual controversy cannot be conjectural or
> problematic; it must have substance in the sense that it limns differing

versions of the truth which a factfinder must resolve at an ensuing trial. Conclusory allegations, improbable inferences, and unsupported speculation" will not suffice." *Id.* (citations omitted).

Moreover, "the standards are the same where … both parties have moved for summary judgment." *Bienkowski v. Northeastern Univ.*, 285 F.2d 138, 140 (1st Cir. 2002)("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with rule 56 standard.").

The moving party may prevail on summary judgment either by submitting affirmative evidence negating an element of the nonmovant's claim, or demonstrating that the nonmovant has no reasonable expectation of proving an element of the claim due to insufficient evidence. *See Fireman's Fund Ins. Co. v. Harley Realty Co.,* 24 F.Supp.2d. 117, 118 (D. Mass. 1998, Keeton, J.).

**B.     There is a genuine issue of fact as to the proximate cause of the explosion and fire.**

3A Marine's simple argument is that the cause of the fire is undetermined.  That is an incomplete assessment of the facts.  Both Sundquist and Hennessey say much more.

There is no dispute that the explosion and resulting fire came from the vessel's high pressure fuel system.[1]  *See Plaintiff's Facts* ¶¶ 57–60, 62. Lundmark's expert goes further to opine that the cause and origin of the explosion and subsequent fire was a loose fitting at the fuel pump of the port engine that 3A Marine installed which resulted in a gasoline vapor cloud ignition within the engine compartment.  *See* Affidavit of Michael Hennessy ¶ 4; *Plaintiff's Facts* ¶¶ 33 and 55.

Upon inspection and review, Massachusetts Environmental Police Officer John Girvalakis determined the loose fuel fitting located at the fuel pump of the port engine was

---

[1] 3A Marine's expert has another theory that he himself admits has never been tested.

turned at a different angle which was inconsistent with the normal torque rating. *See Plaintiff's Facts* ¶ 52. Although Officer Girvalakis was not definitive in his determination of fire cause, he testified that the only fire cause he could not rule out was a maintenance mishap. *See Plaintiff's Facts* ¶ 54. Officer Girvalakis testified that he could not be certain in his fire-causation determination due to the fire's intense burn and heat damage. *See Plaintiff's Facts* ¶ 53. In a signed and sworn Affidavit, Lundmark's expert determined that cause and origin of the explosion and subsequent fire was due to the loose fuel fitting at the fuel pump of the port engine. *See* Affidavit of Michael Hennessy ¶ 4. The loose fuel fitting resulted in a gasoline vapor cloud ignition within the engine compartment of the vessel which directly caused the explosion and fire. *See* Affidavit of Michael Hennessy ¶ 4; *Plaintiff's Facts* ¶ 54. Further, Plaintiff's expert testified that only the port fuel fitting was not properly torqued or there was an incorrect torque measurement due to the deformities caused by the fire. *See Plaintiff's Facts* ¶ 70. Plaintiff's expert opines that if the intense heat during the fire caused the fuel fitting to loosen, the heat would have loosened both fuel fittings and not just the fuel fitting at the port engine's fuel pump. *See Plaintiff's Facts* ¶ 71. That fuel pump is the same pump 3A Marine replaced two years earlier. *See Plaintiff's Facts* ¶33.

Clearly and admittedly, Plaintiff is not a do-it-yourselfer and fully relied upon 3A Marine to care for and maintain his engine. *See Plaintiff's Facts* ¶¶ 26–28. After all, 3A Marine holds itself out as a competent vessel repair facility skilled in doing the type of work requested by Plaintiff. The evidence provided is that during the period of July 6, 2014 and July 24, 2014, Plaintiff complained to 3A Marine that there was a smell of gasoline and that he wanted 3A Marine to investigate and fix this problem. *See Plaintiff's Facts* ¶¶ 35–42. The evidence also supports that 3A Marine inspected the Vessel's system on each occasion and made an adjustment

to a conclave on the fuel tank.  *See Plaintiff's Facts* ¶¶ 39–40.  3A Marine told Plaintiff that the

Vessel was safe. *See Plaintiff's Facts* ¶ 40. On August 24, 2014, the Vessel's high pressure fuel

system exploded causing injuries to Lundmark.  *See Plaintiff's Fact's* ¶¶ 48–50.   The cases

relied upon by 3A Marine are factually distinguishable from the case at bar.

*Fairest-Knight v. Marine World Distributors, Inc.,* 652 F.3d 94 (1st Cir. 2011), involved a

recreational vessel owner who had bought a boat from the Defendant which turned out to have

chronic problems.  The only evidence to suggest that the Defendant's acts or omissions were the

source of the vessel's problems were invoices detailing that the boat could not be used for its

intended use over extended periods of time.  *Id.* at 101 ("The fact that multiple repairs were

required without more, cannot be taken to establish it was Marine World's unworkmanlike

conduct that brought about the need for the repairs.").  However, in this case Parry made two

specific requests in July for 3A Marine to check his fuel system due to the smell of gas.  3A

Marine failed to take appropriate steps to find the leak in the engine's high pressure fuel system

that resulted in the explosion and fire which appears to have resulted from the loose fitting.  *See*

*Plaintiff's Facts* ¶¶ 54–55.

Plaintiff had a right to rely on the expertise of 3A Marine and had reason to expect a

stable seaworthy vessel upon completion of 3A Marine's inspection and repairs, regardless of the

condition of the Vessel prior to the repairs.  This creates the warranty that binds 3A Marine to

use the degree of diligence, attention, and skill adequate to complete the task.  *See LaEsperanza*

*De. P.R., Inc. v. Perezy Cia. De P.R.*, 124 F.3d 10 (1st Cir. 1997).

The other cases relied upon by 3A Marine involve instances when vessel crew members

tinker with random repairs.  *Penn Mar., Inc. v. Rhodes Electronic Services, Inc.*, 41 F.Supp.3d

507 (E.D. LA 2014) (Penn had not sufficiently ruled out the possibility that the accident was caused by the Captain's improper operation of the autopilot).

**C.      There are sufficient facts to prove by a preponderance of the evidence that 3A Marine failed to fulfil its contractual and implied warranty obligations to Parry in regard to the Vessel's 2014 spring commissioning.**

3A Marine breached their contractual obligation and implied warranty of workmanlike performance with Plaintiff by failing to properly identify and repair the fuel leak that caused the explosion and subsequent fire.

Plaintiff agrees that the identity of the party in control or possession of the vessel at the time of the incident is *a* factor to consider when determining whether circumstantial evidence of negligence or causation is sufficient. *See Fairest-Knight*, 652 F.3d at 101. The cases that fail to prove causation with circumstantial evidence are distinguishable from the case at bar. Typically, there is additional maintenance or work performed by crew members or other third parties. *See Penn Mar., Inc.*, 41 F.Supp.3d 507. Or there is an extended period of time in the owner's possession before the loss. *See Fairest-Knight*, 652 F.3d at 101. The basis for those decisions is that they cast doubt on the fairness of the presumption that the marine servicer was responsible for the loss. There is no such doubt here.

The difference in this case is the fuel smell issue repeatedly identified by Plaintiff, *See Plaintiff's Facts* ¶¶ 34–36, 42, as well as the proximity and exclusivity of control that 3A Marine had over the maintenance of the Vessel. Here, 3A Marine failed to detect the cause of the fuel smell and failed to properly repair the fuel system that later caused the explosion and fire. 3A Marine's last inspection and repair to part of the fuel system occurred within a very close proximity to the explosion and subsequent fire to the Plaintiff's Vessel—within one month in time and only two to three trips in distance traveled. *See Plaintiff's Facts* ¶¶ 37–42. Further, 3A

Marine had exclusive control over the maintenance of the vessel as Plaintiff contracted

exclusively with 3A Marine to handle all maintenance and repairs.  There is absolutely no

evidence that any other party touched the engine, including the Plaintiff. The circumstantial

evidence surrounding 3A Marine's replacement, service, and repair of the fuel system proves

that their negligent detection and repair of the fuel system caused the fuel system to produce a

hazardous atmosphere, to ignite, and then explode.  Therefore, the Plaintiff requests this

Honorable Court to deny the Defendant's Motion for Summary Judgment.

**D.      Parry's negligence and gross negligence claims are allowed under *East River* since it concerns "other property."**

In this action, Plaintiff is seeking to tender 3A Marine to Lundmark for the damages

alleged to have been sustained by Mr. Lundmark.  Plaintiff is not seeking any damages for any

physical harm sustained by Parry or the loss of his vessel.[2]  Plaintiff is seeking what *East River*

refers to as damage to "other property."

> "The 'economic loss' rule is a products liability concept that precludes
> tort claims, whether stated in negligence or strict liability, for damages
> the alleged defective product causes to the product itself resulting in
> purely economic losses under the rationale that such claims are
> properly brought as a warranty claim rather than in tort. Only where
> the alleged defective product causes damage to other property (other
> than the defective product itself) or personal injuries, does the
> economic loss rule not apply. In those exceptions, the plaintiff is
> entitled to recover in tort only those damages to the other property or
> for personal injuries sustained as a result, but not the economic losses
> associated with the alleged defective product." *See Isla Nena Air
> Servs., Inc. v. Cessna Aircraft Co.,* 380 F.Supp. 2d 74, 81, *aff'd,*  449
> F.3d 85 (1st. Cir. 2006)(citing *East River Steamship*, 476 U.S. at 874,
> 106 S.Ct. 2295; *Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520
> U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997)).

---

[2] Defendant's argument would be appropriate if Parry was seeking to recover for the loss of his vessel in this action. Parry assigned those rights to his insurer.  The insurer will be commencing a subrogation action against 3A Marine shortly in which they seek money damages for the loss of the boat.

The negligence claims brought by Plaintiff here are for recovery for the personal injuries

sustained by Lundmark.  As such, the negligence and gross negligence counts are outside the

*East River* economic loss rule as there is no claim for damages to Plaintiff's boat in this action.

 WHEREFORE, Plaintiff Gordon E. Parry respectfully request that this Honorable Court

deny Claimant/Third-Party Defendant, 3A Marine Services, Inc.'s Motion for Summary

Judgment.

       Respectfully submitted


       /s/ David S. Smith
       David S. Smith, Esq.
       BBO No.: 634865
       Farrell & Smith, LLP
       60 Washington St., Suite 303
       Salem, MA 01970
       978-744-8918
       dsmith@FarrellSmith.com


## CERTIFICATE OF SERVICE

 I, David S. Smith, hereby certify that I caused to have served a copy of the foregoing document upon all parties of record utilizing the ECF system this 14th day of March 2018.

       /s/ David S. Smith
       David S. Smith