UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In the Matter of
GORDON E. PARRY, JR., as Owner of     CIVIL ACTION NO.
2003 Chaparral Signature 280 Cabin Cruiser,    15-10686-LTS
MS-2594-AJ, HIN-FGBA0331F203,
for Exoneration from or
Limitation of Liability.

**REPORT AND RECOMMENDATION RE:**
**CLAIMANT/THIRD-PARTY DEFENDANT 3A MARINE SERVICE,**
**INC.'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 117)**

**June 4, 2018**

**BOWLER, U.S.M.J.**

Pending before this court is a summary judgment motion filed by claimant and third-party defendant 3A Marine Service, Inc. ("3A Marine") against plaintiff Gordon E. Parry, Jr. ("Parry"), owner of a 2003 Chaparral Signature 280 cabin cruiser ("the vessel").  (Docket Entry # 117).  After conducting a hearing on March 23, 2018, this court took the motion (Docket Entry # 117) under advisement.

PROCEDURAL BACKGROUND

Parry initiated this action in March 2015 by filing a verified complaint for exoneration from or limitation of liability pursuant to the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501-30512 ("the Limitation Act"), after an explosion

and fire on August 24, 2014 ("the incident") engulfed and sank the vessel in Provincetown harbor in Provincetown, Massachusetts. In June 2015, claimant David P. Lundmark ("Lundmark"), a passenger on the vessel at the time, filed a claim against Parry and an answer. (Docket Entry ## 16, 17). Parry, in turn, filed a reply to the claim (Docket Entry # 25) and an amended third-party complaint (Docket Entry # 38) against 3A Marine. The amended third-party complaint alleges Parry was without fault or knowledge and that 3A Marine is responsible for the injuries and losses resulting from the explosion and fire. The six-count amended third-party complaint sets out causes of action for breach of a maritime repair contract (Count I), negligence (Count II), gross negligence (Count III), indemnification (Count IV), contribution (Count V), and breach of the implied warranty of workmanlike performance (Count VI). (Docket Entry # 38). 3A Marine also filed a claim that the lack of due care on the part of Parry, Lundmark, and/or the vessel's unseaworthiness caused the incident as well as an answer to the amended third-party complaint and a counterclaim against Parry for contribution and indemnity. (Docket Entry ## 39, 40).

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" <u>Tobin v. Federal Express</u>

Corp., 775 F.3d 448, 450 (1st Cir. 2014).  It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Pierce v. Cotuit Fire District, 741 F.3d 295, 301 (1st Cir. 2014).

"An issue is 'genuine' when a rational factfinder could resolve it [in] either direction" and a "fact is 'material' when its (non)existence could change a case's outcome."  Mu v. Omni Hotels Mgt. Corp., 882 F.3d 1, 5 (1st Cir. 2018); accord Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014).  The record is viewed in favor of the nonmoving party, i.e., Parry, and reasonable inferences are drawn in his favor. See Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017) (court examines "'record in the light most favorable to the nonmovant' and must make 'all reasonable inferences in that party's favor'"); Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a summary judgment motion, a court may examine "all of the record materials on file" even if not cited by the parties.  Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014); Fed. R. Civ. P. 56(c)(3). "'"[C]onclusory allegations, improbable inferences, and

unsupported speculation"'" are ignored.  Garcia-Garcia v. Costco
Wholesale Corp., 878 F.3d at 417.  Adhering to this framework,
the facts are as follows.

FACTUAL BACKGROUND[1]

In 2007, Parry began servicing the vessel at 3A Marine.
Located in Hingham, Massachusetts, 3A Marine repairs and sells
recreation boats.  (Docket Entry # 38, ¶ 18) (Docket Entry # 40,
¶ 18) (Docket Entry # 122-6) (Docket Entry # 122-2, p. 2).[2]
Patrick J. Desmond ("Desmond"), 3A Marine's customer service
manager, was Parry's "point person" at 3A Marine.  (Docket Entry
# 122-2, pp. 2-3).  According to Parry, 3A Marine was "in charge
of doing [the] mechanical stuff" and provided maintenance and
repairs to the vessel from the fall of 2007 to the August 24,
2014 incident.  (Docket Entry # 122-1, pp. 2, 13).  If something
was not working on the vessel, Parry would contact 3A Marine to
take care of the matter.  (Docket Entry # 122-1, p. 13).  More
specifically, Parry used 3A Marine to service the vessel's "Volvo
Penta engine because 3A Marine had Volvo Penta certified

---

[1]  In adjudicating the summary judgment motion, this court
reviewed the entire summary judgment record.  Any failure to
recite certain parts of the record does not mean this court did
not consider them.

[2]  Page numbers refer to the page as docketed rather than
the page of the exhibit or deposition transcript.

mechanics and [sic] were highly recommended."[3]  (Docket Entry #
122, ¶ 29) (Docket Entry # 124, ¶ 29) (Docket Entry # 122-1, p.
6).  In the summer of 2012, Desmond even traveled to Provincetown
to service the vessel's port engine when it would not start.[4]
(Docket Entry # 122, ¶ 32) (Docket Entry # 124, ¶ 32) (Docket
Entry # 122-1, p. 10).  On July 7, 2012, 3A Marine replaced a
fuel pump for the port engine because it was "not developing
full" revolutions per minute.  (Docket Entry # 122-6, p. 11).

In April 2014, Parry faxed a "'2014 Spring Commissioning
Checklist' to 3A Marine" detailing the commissioning services he
needed "before the 2014 boating season."  (Docket Entry # 118, ¶
1) (Docket Entry # 122, ¶ 1).  The services included running and
testing "engine systems" and a "computer diagnostic check."
(Docket Entry # 119-1, Ex. 8, p. 25).  3A Marine performed the
services and Parry paid the $6,123.71 invoice in full in early
August 2014.  (Docket Entry # 118, ¶ 2) (Docket Entry # 122, ¶ 2)
(Docket Entry # 119-1, pp. 15, 27-31).

In the summer of 2014, Parry made approximately three trips
from Savin Hill Yacht Club ("the yacht club") in Dorchester,
Massachusetts, where he moored the boat for the season, to

---

[3]   3A Marine repair orders list "Volvo Penta" in addition to
other manufacturers.  (Docket Entry # 122-6).

[4]   The vessel had a starboard and a port engine.  (Docket
Entry # 122-1, pp. 9-10).

Provincetown.[5]   (Docket Entry # 118, ¶ 4) (Docket Entry # 122, ¶ 4) (Docket Entry # 119-1, pp. 3-6).  On July 3, 2014, Parry "noticed a gasoline odor on [the] vessel when he brought the vessel into [a] gas dock" at the yacht club.  (Docket Entry # 122, ¶ 34) (Docket Entry # 124, ¶ 34) (Docket Entry # 122-1, p. 18).  He opened the engine compartment, ran a blower, and did not see any gasoline in the bilge.  (Docket Entry # 122-1, p. 19). After fueling the vessel, he returned it to the mooring.  That evening, he used the vessel for a trip to Weymouth Landing for a fireworks display.  The vessel "ran fine" although Parry smelled a slight gasoline odor.  (Docket Entry # 122-1, pp. 20-22).

On or about July 7, 2014, Parry told Desmond about the smell of gasoline and brought the vessel to 3A Marine.[6]  (Docket Entry # 122-1, pp. 22-23).  When Parry picked up the vessel on Saturday, July 12, 2014, he asked Desmond what he found "with the gasoline."  (Docket Entry # 122-1, p. 25).  Desmond informed Parry that he "inspected the whole fuel system and didn't find

---

[5]  Parry represents that, "Between July 25, 2014 and the day the vessel exploded, Plaintiff made two or three trips to Provincetown."  (Docket Entry # 122, ¶ 41).

[6]  Desmond has no memory of the conversation.  (Docket Entry # 125-1, pp. 17-19, 23).  He also testified that he would remember such a comment because "[a] fuel issue is something we take very seriously" and a work order would reflect an inspection of the fuel system.  (Docket Entry # 125-1, pp. 19, 24-26).  The record, however, is construed in Parry's favor.  See Jones v. City of Boston, 845 F.3d 28, 32 (1st Cir. 2016) (recognizing requirement to resolve disputed facts in non-moving parties' favor).

anything wrong with it and didn't see anything wrong," according to Parry.[7]  (Docket Entry # 122-1, p. 25).

After the above-noted inspection in early July, neither Parry nor any passenger noticed a smell of gasoline until July 25, 2014.  (Docket Entry # 122-1, p. 26).  On July 25, 2014, Parry again smelled an odor of gasoline.  (Docket Entry # 122-1, p. 18).  Specifically, after fueling the vessel at the yacht club, he noticed a gasoline odor in the cabin.  (Docket Entry # 122, ¶ 42) (Docket Entry # 124, ¶ 42) (Docket Entry # 122-1, pp. 18, 27).  Parry again opened the engine compartment and did not observe "anything."  (Docket Entry # 122-1, p. 27).  After running the blower, he brought the vessel to 3A Marine.  (Docket Entry # 122, ¶ 42) (Docket Entry # 124, ¶ 42) (Docket Entry # 122-1, pp. 27).

At 3A Marine, Desmond "inspected the fuel system, and" discovered "there was a conclave in the gas tank," according to

---

[7] Parry's testimony as to what Desmond said is not hearsay. See Fed. R. Evid. 801(d)(2)(C), (D); Fischer v. Forestwood Co., Inc., 525 F.3d 972, 984 (10th Cir. 2008) ("[a]s president, he was 'authorized' by Forestwood 'to make a statement concerning' hiring and firing") (citing Fed. R. Evid. 801(d)(2)(C)); Schweitzer v. Teamster Local 100, 413 F.3d 533, 538 (6th Cir. 2005) ("reasonable to surmise that a Secretary-Treasurer of a union has the authority to make a statement on behalf of the union" under Fed. R. Evid. 801(d)(2)(C)); U.S. v. Agne, 214 F.3d 47, 54-55 (1st Cir. 2000) (discussing Fed. R. Evid. 801(d)(2)(D)); Woodman v. Haemonetics Corp., 51 F.3d 1087, 1094 (1st Cir. 1995) (discussing Fed. R. Evid. 801(d)(2)(D)).

Parry.[8]  (Docket Entry # 122-1, p. 28).  Desmond also replaced
two canvas straps that supported a top for a windshield.  He
inspected the engine's trim but has no memory of inspecting
anything else in the engine compartment on July 25, 2014.
(Docket Entry # 125-1, pp. 8-10, 19).  Desmond has no memory of
Parry telling him about an odor of gasoline on July 25, 2014.[9]
(Docket Entry # 125-1, pp. 17-19).  When Desmond finished the
repairs, Parry asked him if the vessel was safe and Desmond
replied, "Yes."[10]  (Docket Entry # 122-1, p. 29).  Desmond also
spoke to Parry about the trim issue.  (Docket Entry # 125-1, pp.
7-8).

    3A Marine did not undertake any service or repair of the
vessel after July 25, 2014.  (Docket Entry # 118, ¶ 6) (Docket
Entry # 122, ¶ 6) (Docket Entry # 119-1, p. 19).  During the

_____

    [8]  See fn. 7.  Separately, when asked at 3A Marine's Fed. R.
Civ. P. 30(b)(6) deposition, "What is a conclave in the gas
tank," Desmond replied he had "no idea."  (Docket Entry # 125-1,
p. 11).  Here again, the record is viewed in Parry's favor and
material, factual disputes are resolved in his favor as the non-
moving party.  See Jones v. City of Boston, 845 F.3d at 32
("district court was required to assume that any disputes of
material fact-including conflicting opinions offered by competent
experts—could be resolved by the jury in the Officers' favor").

    [9]  Viewing the record in Parry's favor, as required, the two
incidents of Parry noticing a gasoline odor, informing Desmond
about the odor, and Desmond conducting the inspections and
responding to Parry's questions in the manner Parry described
took place.

    [10]  Parry's recitation of Desmond's response is not hearsay.
See fn. 7.

three trips that summer between the yacht club and Provincetown, the engines were operating or running fine.  (Docket Entry # 119-1, pp. 5-7).  In fact, on the second trip, Parry "stated that the Vessel was 'running the best it's run in a long time.'"  (Docket Entry # 118, ¶ 5) (Docket Entry # 122, ¶ 5) (Docket Entry # 119-1, pp. 5-6).

Parry did not detect a gasoline odor after the July 25, 2014 repair up to the time of the explosion and fire one month later on August 24, 2014.  (Docket Entry # 119-1, p. 19).  Parry also did not contact 3A Marine with respect to the "engines running roughly or improperly."  (Docket Entry # 119-1, p. 19).  In the days leading up to the incident, Parry recalls that the vessel ran the best it had run in recent years.  (Docket Entry # 119-1, pp. 19-20).

On Friday, August 15, 2015, Parry took the vessel from the yacht club to Provincetown harbor.  During the trip, the vessel "ran really good," according to Parry.  (Docket Entry # 122-1, pp. 32-33).  After arriving in the harbor, the vessel stayed on a mooring until Sunday, August 17, 2014.  (Docket Entry # 122-1, pp. 32-34).  During that weekend, neither Parry nor any visitors noticed or reported a smell of gasoline.  (Docket Entry # 122-1, p. 34).  Parry went "out to dinner" on one of the evenings. (Docket Entry # 122-1, p. 34).

On August 17, 2014, Parry left the vessel after locking and

9

securing her to the mooring.  (Docket Entry # 122-1, p. 35).  He
traveled by ferry to Boston and returned to Provincetown on
August 20, 2014, at which point he boarded the moored vessel.
(Docket Entry # 122, ¶ 44) (Docket Entry # 124, ¶ 44).  On the
morning of Saturday, August 23, 2014, Parry operated the vessel's
engines for 30 minutes "without any issues or problems" in order
to charge the batteries.  (Docket Entry # 118, ¶ 8) (Docket Entry
# 122, ¶¶ 8, 45) (Docket Entry # 124, ¶ 45) (Docket Entry # 122-
1, pp. 38-39).  He was alone on the vessel at the time.  (Docket
Entry # 122-1, p. 39).

        Parry left the vessel, still moored, later that day to go
ashore and returned late in the evening.  (Docket Entry # 122-1,
p. 37).  Parry and Lundmark, who arrived on the vessel at some
point on August 23, 2014, stayed on the vessel that night.
(Docket Entry # 122, ¶ 46) (Docket Entry # 124, ¶ 46) (Docket
Entry # 122-1, p. 39).  "During the weekend of August 23 and 24,
Parry did not smell any gasoline while onboard the Vessel."
(Docket Entry # 118, ¶ 9) (Docket Entry # 122, ¶ 9).

        On Sunday, August 24, 2014, Parry "made the vessel ready to
get underway."  (Docket Entry # 122, ¶ 47) (Docket Entry # 124, ¶
47).  Before he started the engines, he turned on the vessel's
blower system.  (Docket Entry # 122-1, pp. 41, 44).  The blowers
remained on after Parry started the engines.  (Docket Entry #
122-1, p. 44).  He did not smell any gasoline odor before he

started the engines.  (Docket Entry # 122-1, p. 45).  Lundmark
also did not indicate that he smelled any gasoline.  (Docket
Entry # 122-1, pp. 45-46).

When Parry "started the engines, . . . the port engine
backfired but eventually started up."  (Docket Entry # 122, ¶ 48)
(Docket Entry # 124, ¶ 48) (Docket Entry # 122-1, pp. 43-44).
Thereafter, it "sounded regular," according to Parry.  (Docket
Entry # 122-1, p. 44).  With Parry at the helm, Lundmark released
the mooring lines and returned to a seat on the port side to the
left of the helm.  (Docket Entry # 122-1, pp. 43, 47-48).  Parry
began driving the vessel and, "[s]hortly after letting go of the
mooring lines, the port engine stopped."  (Docket Entry # 122, ¶
49) (Docket Entry # 124, ¶ 49) (Docket Entry # 122-1, pp. 49-50).
Parry restarted the port engine, turned "the blower off,"
proceeded to go through the mooring field, and, as he "near[ed]
the wake zone, . . . started to give the boat more gas."  (Docket
Entry # 122, ¶ 49) (Docket Entry # 124, ¶ 49) (Docket Entry #
122-1, pp. 50-52).  When "the vessel was outside of the mooring
area, [Parry] heard a lot of yelling and a lot of bangs."
(Docket Entry # 122, ¶ 49) (Docket Entry # 124, ¶ 49) (Docket
Entry # 122-1, p. 52).  Turning around, he "saw large flames
going out of the engine compartment."   (Docket Entry # 122-1, p.
52).

Following the explosion, the vessel burned and sank in the

11

harbor.  (Docket Entry # 1, ¶ 6).  Parry's insurance company
arranged for a recovery of the vessel.  (Docket Entry # 1-2, ¶¶
4, 6).  On September 2, 2014, Massachusetts Environmental Police
("MEP") Sergeant John Girvalakis ("Girvalakis"), the first person
to inspect the vessel, took a number of photographs of the
vessel, including the high pressure fuel system on the port
engine.[11]  (Docket Entry # 122, ¶¶ 11, 51) (Docket Entry # 124, ¶
51) (Docket Entry # 122-4, pp. 2-3, 6) (Docket Entry # 125-5, p.
10) (Docket Entry # 118, ¶ 11).  Another MEP Sergeant accompanied
Girvalakis "for a portion of the time."  (Docket Entry # 125-5,
p. 11) (Docket Entry # 119-1, p. 15).

Girvalakis testified that he observed a fuel fitting on the
high pressure fuel system for the port engine positioned with the
nozzle pointed forward, away from the engine.  (Docket Entry #
122-4, p. 7).  Believing the position was incorrect, Girvalakis
turned the fuel fitting clockwise such that it fitted "snugly."[12]
(Docket Entry # 122-4, pp. 7-9).  He described that the fitting
"was loose and turned freely."  (Docket Entry # 122-4, p. 8).  He
then removed the fitting, looked inside, and observed "[w]hat
appeared to be what was left of an O-ring."  (Docket Entry # 122-

---

[11]  Girvalakis is presently a lieutenant.  (Docket Entry #
122-3, p. 4).

[12]  Girvalakis' photographs depict the high pressure fuel
line before and after he turned the fitting.  (Docket Entry #
122-4, pp. 3-4, 6-8).

4, p. 12).

A second inspection of the vessel took place on October 14, 2014 at Bay Sails Marine in Wellfleet, Massachusetts, where the vessel was stored.  (Docket Entry # 118, ¶ 11) (Docket Entry # 122, ¶ 11).  The fire cause and origin investigators at the joint inspection included:  Steven Sundquist ("Sundquist"), who represented Parry's interests; Michael Higgins ("Higgins"), who represented 3A Marine's interests; Michael Hennessy, who represented Lundmark's interests; and Girvalakis.  (Docket Entry # 118, ¶ 11) (Docket Entry # 122, ¶ 11) (Docket Entry # 128-1).  Sundquist and Girvalakis placed "the origin of the fire" as "the engine compartment."  (Docket Entry # 119-3, p. 10) (Docket Entry # 122-3, p. 7).

Girvalakis could not rule out a maintenance mishap as the cause of the incident but "'concluded'" that the incident was "'accidental in nature.'"  (Docket Entry # 119-3, p. 13) (Docket Entry # 122-4, p. 19).  He could not say whether maintenance had an impact, other than the fact that boats do not spontaneously explode and "[s]omething would have" occurred to allow the explosive environment in the engine compartment.  (Docket Entry # 119-3, p. 10).  When asked whether he knew "what caused the looseness on the nut on [the] high pressure fuel system on the port engine," he replied, "No.  I can't identify whether it was [a] human factor or if it was heat-related or some type of

13

maintenance issue.  I can't make that determination."  (Docket Entry # 119-3, p. 7).  He did rule out a gas can located forward of the engine compartment, an outboard engine "taken off the dinghy," and criminal activity.[13]  (Docket Entry # 122-4, pp. 18-19).  Girvalakis also testified it was "not uncommon" to have "difficulty removing a vessel from the seafloor," which would change the condition of the vessel.  (Docket Entry # 125-5, p. 9).

Relevant testimony at Girvalakis' deposition, as highlighted by Parry and/or 3A Marine, reads as follows:

Q.  When you write "I cannot rule out the possibility of a maintenance mishap at this time," what do you mean?

A.  I mean boats just don't spontaneously explode.

Q.  Sure.

A.  So, in order for a boat to explode, you have to have

---

[13]   The following exchanges took place at Girvalakis' deposition:

Q.  And you said you ruled out all these other potential causes, and if there was another cause other than a maintenance mishap that you couldn't rule out, that would be in your report, that would be in writing, correct? . . .

A.  I would think it would be . . .

Q.  And at that point, the only one that you list here that you couldn't rule out was a maintenance mishap, you'll agree with me?

A.  Correct.  And perhaps there's something that I overlooked, but I don't recall.  I don't think so.

(Docket Entry # 122-4, pp. 17, 19).

some type of -- you have to have fuel, you have to have
heat, you have to have oxygen, and in this case, you had to
have some type of an explosive atmosphere in the rate [sic]
mixture, ratio between fuel vapors and/or oxygen.  It's a
balance.  If you have too rich an environment, you don't
have combustion.  If you have too lean an environment, you
don't have combustion.  What I'm saying is there was some
type of a fuel issue in here in which they had an explosive
environment created which ultimately caused the explosion
and fire.  Whether that's some type of maintenance issue,
you know, maintaining the boat, working on the boat,
changing filters on the boat, something to do with the fuel
system on the boat, I can't be certain, and I can't direct
you to a specific cause because the nature of the fire was
so intense that a lot of items were burned, and heat
significantly can distort things.  And like I said, heat is
the best type of wrench you can get.  It will loosen up all
types of stuff.  That's not to say that a fitting was put on
incorrectly or something was put on incorrectly to allow
that to escape.  Certainly that could be the case as well.
I can't give you a definitive answer.

Q.  So, your investigation didn't reveal that any of the
fittings were not tightened by someone who serviced the
engines?

[Objection].

A.  Again, I can't definitively come out with that.  I can
tell you the origin of the fire was the engine compartment.

Q.  So, when you say I cannot rule out the possibility of a
mishap at this time, you're saying, forgive me, but so I
understand, you don't know whether the maintenance had an
impact on it or it didn't, fair?

[Objection].

A.  I can't say -- well, again, boats just don't
spontaneously explode.  Something would have had to have
occurred to allow that explosive environment.

Q.  But you don't know what that specific something is, sir?

[Objection].

A.  No, I don't.

15

(Docket Entry # 119-3, pp. 8-10).

In addition to opining that the origin of the explosion and fire was in the engine compartment, Sundquist indicated that "the cause" was "the ignition of the gasoline vapors that were present in the engine compartment" and testified that the source of the gasoline was a leak "from the pressurized system of the engine's fuel system."[14]   (Docket Entry # 122-3, pp. 11-12, 17).   Sundquist reasoned that it would make sense that the leak "came out of the high pressure line," but he did not know where the leak occurred in the fuel delivery system and he did not know what caused the gasoline vapors to accumulate in the engine compartment from the fuel delivery system.   (Docket Entry # 122-3, pp. 12-14, 17-19).

Sundquist also recognized that Girvalakis previously manipulated one of the fuel fittings in the high pressure fuel line for the port engine.[15]   (Docket Entry # 122-3, pp. 3-5). Sundquist described the fitting as one "that comes loose where it's not supposed to come loose," which is an indication "that it

_____

[14]   The only place for the vapor "to come from," i.e., originate, was "the engine fuel system," according to Sundquist. (Docket Entry # 122-3, pp. 13-14).

[15]   Sundquist testified that the line removed from the pump was the supply line.  (Docket Entry # 122-3, p. 20).   The pressure on the supply or discharge side of the fuel pump is 50 to 60 pounds per square inch.  (Docket Entry # 122-3, p. 16). The "designated torque rating" by the manufacturer as sufficient to hold the fitting in place "was 12 to 15 pounds of torque." (Docket Entry # 122, ¶ 68) (Docket Entry # 124, ¶ 68) (Docket Entry # 122-3, pp. 21-22).

may not be have been torqued correctly" or an indication that "it may have been torqued correctly and the torque measurement is incorrect because of the deformities, contamination and so forth within the threaded connection." (Docket Entry # 122-3, pp. 20, 25-26, 42). Sundquist had no evidence to suggest "that 3A Marine did not properly torque the . . . fitting on the high pressure fuel pump on the port engine." (Docket Entry # 125-4, p. 10).

When asked if the intensity of the fire could have caused the loosening, Sundquist replied that he would expect that the fire "would have loosened both" fittings. (Docket Entry # 122-3, p. 26). Other than the fuel delivery system, Sundquist did not know the "particular piece of equipment in the vessel" that leaked or "where the fuel leak existed."[16] (Docket Entry # 122-3, pp. 13, 17).

Relevant testimony at Sundquist's deposition, as emphasized by Parry and/or 3A Marine, includes the following:

A. As highlighted in my report, I don't know where the leak occurred.

Q. That's my point. You don't know where the leak in the fuel delivery system occurred, correct?

A. That's what I wrote in my report. Yes.

Q. So we don't know what caused the vapors to accumulate,

---

[16] Sundquist described the fuel system as operating in a loop insofar as, after the fuel leaves the fuel pump pressurized, it travels "to fuel injectors through the distribution rails, and then back to the pump itself." (Docket Entry # 122, ¶ 72) (Docket Entry # 124, ¶ 72) (Docket Entry # 122-3, p. 15).

or where the vapors originated, what particular piece of
equipment in the vessel leaked, correct?

A.  Yes.  Except for the fact we know there was enough vapor
generation, and the only place for it to come from, is the
engine fuel system.

Q.  In your opinion?

A.  In my opinion, yes . . .

Q.  And within NFPA 921, there's the causes of fires, have
certain classifications, correct?[17]

A.  Yes.

Q.  So how would you determine, or what classification would
you assign to the explosion onboard Mr. Parry's vessel?

A.  It was undetermined.

Q.  Why is it undetermined, sir?

A.  Because the exact cause of the fuel leak from the
pressurized fuel system of the engines, was not identified .
. .

Q.  And, again, the fuel lines are all burnt up, correct?

A.  Correct . . .

A.  I don't know where the fuel leak existed.

Q.  Okay.  Okay.  The fact that there's a ton of fuel in
this bilge, correct?

A.  There's a substantial amount of fuel based on the smoke

---

[17]   NFPA 921 refers to the National Fire Protection
Association 921 Guide ("NFPA 921"), which "is a document intended
to 'establish guidelines and recommendations for the safe and
systematic investigation or analysis of fire and explosion
incidents.'"  Manuel v. MDOW Ins. Co., 791 F.3d 838, 840 n.3 (8th
Cir. 2015).  The relevant provision in the 2017 edition defines
an "Undetermined Fire Cause" as:  "Whenever the cause cannot be
proven to an acceptable level of certainty . . .."  NFPA 921, §
20.1.4 (2017 ed.).

pattern I saw in the Harbormaster's video, yes.

Q.  Does the amount of fuel in the bilge suggest to you that
it was coming from the pressurized side of the system? . . .

A.  As I stated previously, I cannot say specifically where
that leak was, but the amount of fuel that was there was
substantial.  Would it make sense that it came out of the
high pressure line, yes.  That's where you are going to get
the most fuel.  Actually, a high pressure line, if you have
a small crack or a loose fitting and under pressure, you can
atomize that gasoline as it's coming out and make it more of
a vapor, make it more susceptible to explosion, but not
knowing exactly where it is . . .

(Docket Entry # 119-4, pp. 3-4) (Docket Entry # 122-3, pp. 9, 13,

17-19).  Higgins, 3A Marine's expert, similarly "testified that

'NFPA said it should be classified as undetermined.'"  (Docket

Entry # 118, ¶ 22) (Docket Entry # 122, ¶ 22).

DISCUSSION

3A Marine seeks summary judgment on "all claims," including

the maritime negligence claims, in the amended third-party

complaint because Parry fails to establish sufficient evidence of

causation and fails "to identify any act or omission attributable

to 3A Marine" which caused the fire and explosion.  (Docket Entry

## 117, 120, 126).  Parry responds that genuine issues of fact

exist as to the proximate cause of the fire and 3A Marine's

failure to fulfil its contractual and implied warranty

obligations.  (Docket Entry # 123).

I.  Negligence and Gross Negligence Claims

As noted, 3A Marine contends that no genuine issues of

material fact exist regarding the proximate or legal cause of the

19

explosion and fire.  (Docket Entry # 120, p. 8).  Parry submits "there is a genuine issue of fact as to the proximate cause of the explosion and fire."  (Docket Entry # 123, p. 8).

Parry does not object to the proximate or legal cause standard of causation that 3A Marine employs.  See Great American Insurance Co. v. Pride, 847 F. Supp. 2d 191, 204 (D. Me. 2012) ("[c]ausation under general maritime negligence law is similar to the common law which requires but for causation coupled with proximate or legal causation"); see also 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-8 (5th ed. 2017) ("ship repair contract is a bailment"); Goudy & Stevens, Inc. v. Cable Marine, Inc., 924 F.2d 16, 18 (1st Cir. 1991) ("bailor must establish . . . that its negligence was the proximate cause of the damage") (action in admiralty); see generally 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-3 (5th ed. 2017) (discussing proximate or legal cause).  Rather, Parry maintains that the evidence is sufficient to create a genuine material issue of fact as to proximate cause.[18]  (Docket Entry # 123, pp. 8-11).  "[T]he

---

[18]  Because Parry does not raise an argument that a lesser causation standard than proximate cause applies, he waives this issue.  See Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("district court was 'free to disregard' the state law argument that was not developed in Coons's brief"); Vallejo v. Santini-Padilla, 607 F.3d 1, 7 & n.4 (1st Cir. 2010) ("[p]laintiffs have not cited a single authority in support of their assertion that their failure to timely oppose the motion to dismiss did not constitute waiver" and noting that "[p]laintiffs did not properly raise their arguments below"); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999)

familiar elements of negligence—duty, breach, causation, and damages—apply in maritime cases" and "'principles of maritime negligence'" supply "substance to each element." <u>Sawyer Brothers, Inc. v. Island Transporter, LLC</u>, 887 F.3d 23, 29 (1st Cir. 2018); <u>Great American Insurance Co. v. Pride</u>, 847 F. Supp. 2d at 203; <u>see</u> <u>La Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico</u>, Inc., 124 F.3d 10, 17 (1st Cir. 1997) ("negligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law").

Parry bears the underlying burden to show by a preponderance of the evidence that the repairs "actually and proximately caused the fire." <u>Great American Insurance Co. v. Pride</u>, 847 F. Supp. 2d at 204 (shipowner "failed to establish by a preponderance of the evidence that Caldwell's repairs actually and proximately caused the fire and sinking"). He may establish such causation by circumstantial evidence. <u>See</u> <u>Fairest-Knight v. Marine World Distrubutors, Inc.</u>, 652 F.3d 94, 101 (1st Cir. 2011); <u>Great American Insurance Co. v. Pride</u>, 847 F. Supp. 2d at 205 (res ipsa loquitur applies in admiralty and "allows negligence to be proved by circumstantial evidence"). The circumstances, however, must "allow for a 'strong inference[]' of causation" and the "[e]xclusivity of control or possession is an important factor"

---

("district court is free to disregard arguments that are not adequately developed").

to support "this inference." Fairest-Knight v. Marine World
Distributors, Inc., 652 F.3d at 101 (citing Marquette
Transportation Co., Inc. v. La. Mach. Co., Inc., 367 F.3d 398,
402 (5th Cir. 2004)); see also Marquette Transportation Co., Inc.
v. La. Mach. Co., Inc., 367 F.3d at 404 (referring to cases
allowing "strong inferences" as to both negligence and
causation). Here, as in Marquette, the vessel was out of 3A
Marine's control for a month before the fire. See Marquette
Transportation Co., Inc. v. La. Mach. Co., Inc., 367 F.3d at 402
(upholding bench trial conclusion that plaintiff failed to show
causation for maritime negligence claim regarding improper
torquing of valve fitting when vessel operated without incident
for five weeks after repair and before fire); Great American
Insurance Co. v. Pride, 847 F. Supp. 2d at 205 (rejecting res
ipsa loquitur doctrine in maritime negligence claim because
vessel owner took boat out for six to eight hours after repairs
and prior to fire). Although Marquette, cited with approval in
Fairest-Knight, 652 F.3d at 101, and Great American involved
bench trials, the length of time during which the vessel was out
of 3A Marine's exclusive control is substantial. The one-month
period of time during which 3A Marine had *no* exclusive control
over the vessel eviscerates any reliance on res ipsa loquitur as
a presumption to infer causation. See Marquette Transportation
Co., Inc. v. La. Mach. Co., Inc., 367 F.3d at 403-405; accord

22

Fairest-Knight v. Marine World Distributors, Inc., 652 F.3d at
101 (paraphrasing N. Ins. Co. of N.Y. v. Point Judith Marina,
LLC, 579 F.3d 61, 69-70 (1st Cir. 2009), that, where "marina did
not have exclusive possession of the boat, no presumption of
fault would apply") (breach of workmanlike performance claim).
Indeed, the brief period of time in Northern Insurance Company
after the defendant moved the vessel to its slip and completed
its work to when the vessel sank a few days later evidences that
the one month-period in the case at bar is not sufficient to give
rise to the presumption as a matter of law.  See N. Ins. Co. of
N.Y. v. Point Judith Marina, LLC, 579 F.3d at 65, 69-70.  If
anything, with the exception of going ashore Sunday morning for
an estimated 90 minutes (Docket Entry # 122-1, p. 40), Parry had
exclusive control of the vessel at the time and shortly prior to
the incident.

Due to 3A Marine's lack of exclusive control of the vessel
during the month before the incident, Parry requires additional
evidence to create a genuine dispute of material fact that the
fire was more likely than not caused by 3A Marine's negligence.
See generally Marquette Transportation Co., Inc. v. La. Mach.
Co., Inc., 367 F.3d at 405 (credible evidence from both experts,[19]
fact that vessel was out of defendant's control for more than a

---

[19] On summary judgment, this court resolves any disputes in
the expert testimony in Parry's favor.

month, and destruction of vessel "made it difficult for Plaintiffs to prove their theory").  Examining the evidence, Parry informed Desmond on two occasions that he noticed a gasoline odor, the last occasion being July 25, 2014.  Desmond inspected the fuel system and repaired the tank the same day. Parry made a number of trips to Provincetown, including after the July 25, 2014 repair.  The day before the incident, Parry ran the engine for 30 minutes to recharge the batteries.  After July 25, 2014, he did not notice a gasoline odor or report to 3A Marine that the engines were running roughly or improperly.  Rather, the vessel ran the best it had in recent years in the days prior to the incident.

Resolving disputes in the expert testimony in Parry's favor, Sundquist "testified that 'the cause of the explosion and subsequent fire [was] the ignition of the gasoline vapors that were present in the engine compartment'" (Docket Entry # 122, ¶ 61) (Docket Entry # 124, ¶ 61, ln. 1) but he did not know what caused the gasoline vapors to accumulate in the engine compartment (Docket Entry # 122-3, p. 13).  The source of the gasoline leak was from the pressurized side of the engine's fuel delivery system with the origin of the explosion and fire in the engine compartment, according to Sundquist.  In short, Sundquist identified the ignition source of the explosion (gasoline vapors in the engine compartment) and further pinpointed the source of

the vapors as leaking from the pressurized side of the engine fuel system.[20]

He additionally testified that the loose fitting on the supply line could not have been torqued correctly *or* the torque measurement was incorrect due to contamination or deformities. He had "no evidence" to suggest "that *3A Marine* did not properly torque the hexagonal shaped fitting on the high pressure fuel pump on the port engine."  (Docket Entry # 125-2, p. 10) (emphasis added).  Sundquist would expect that the heat of the fire would cause both fittings to loosen thus indicating that heat did not cause the loose fitting on the supply line.  Like Higgins, Sundquist classified the *cause* of the fire as "undetermined" under NFPA 921.  (Docket Entry # 119-4, p. 4).  An "undetermined" classification is proper "whenever the cause cannot be proven to an acceptable level of certainty . . .." NFPA 921, § 20.1.4 (2017 ed.).  Whereas Sundquist identified the origin of the explosion, his testimony when viewed in Parry's favor, does not allow a jury to find it was more probable than not that improper torquing of the fitting *by 3A Marine* actually and proximately *caused* the explosion and fire.

Girvalakis concluded that the incident was "accidental in

---

[20]  He theorized that, "if you have a small crack or a loose fitting under pressure" on a high pressure line, "you can atomize that gasoline as it's coming out and make it more of a vapor, make it more susceptible to explosion."  (Docket Entry # 122-3, pp. 18-19).

nature." (Docket Entry # 119-3, pp. 13-14, 18). He could not "rule out the possibility of a maintenance mishap" in the sense that "boats just don't spontaneously explode." (Docket Entry # 119-3, pp. 8, 18). More specifically, he could not be certain whether there was "some type of maintenance issue," such as "changing filters the boat" or "something to do with the fuel system." (Docket Entry # 119-3, p. 9). He ruled out criminal activity, a gas can, and an outboard engine. Girvalakis also thought he would include other causes in his report if he could not rule them out. (Docket Entry # 122-4, p. 17). He did not know what caused the looseness of the fitting, i.e., whether it was a "human factor," a maintenance issue, or heat related. (Docket Entry # 119-3, p. 7). He could not be certain what created the explosive environment of fuel in the engine compartment, i.e., whether it was "maintaining the boat, working on the boat, changing filters on the boat" or "something to do with the fuel system on the boat." (Docket Entry # 119-3, pp. 9-10).

Overall, the foregoing expert testimony does not allow a reasonable jury to find by a preponderance of the evidence that repairs or service undertaken by 3A Marine actually and proximately caused the explosion and fire. Similarly, Parry fails to show that a jury could find that 3A Marine's omissions actually and proximately caused the explosion and fire. Summary

judgment is therefore appropriate on the negligence and gross
negligence claims in the amended third-party complaint.

II.   <u>Breach of Contract and Warranty of Workmanlike Performance</u>

     In moving for summary judgment on the breach of the maritime
contract and implied warranty of workmanlike performance claims,
3A Marine presents similar arguments.  First, it maintains there
is no evidence that it breached the maritime service contract or
the implied warranty by failing to properly service or repair the
vessel.  Second, 3A Marine contends that Parry fails to meet the
requisite evidentiary burden on causation because there is no
evidence showing that 3A Marine breached any obligation to Parry
which caused the explosion and fire.  (Docket Entry ## 120, 126).
Parry argues that the repeated odors of gasoline coupled with 3A
Marine's repair one month before the incident and its exclusive
control over the vessel's maintenance and repair avoid summary
judgment.  Parry also points out that he had a right to rely on
3A Marine's expertise which "creates a warranty that binds" the
company to use the requisite diligence and skill to accomplish
the task.  (Docket Entry # 123).

     "[J]udicially-developed norms of the general maritime law"
as well as "'an amalgam of traditional common-law rules,
modifications of those rules, and newly created rules,' govern
actions in admiralty."  <u>La Esperanza</u>, 124 F.3d at 16.  Under
maritime law, "[a] ship repairer," such as 3A Marine, "may be

liable in contract for a breach of his expressly assumed obligations or for a breach of an implied warranty of workmanlike performance that attaches to admiralty contracts." Id.; accord Fairest-Knight, 652 F.3d at 98. "[O]ral contracts are valid under general maritime law," EIMSKIP v. A. Fish Mkt., Inc., 417 F.3d 72, 76 (1st Cir. 2005), and the implied warranty of workmanlike performance adheres to implied as well as to express maritime contracts. See N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d at 68.

The "implied warranty of workmanlike performance 'parallels a negligence standard rather than imposing the strict liability' that attaches to implied warranties in land-based contracts under the Uniform Commercial Code." La Esperanza, 124 F.3d at 17 (brackets omitted). Under this warranty, "a maritime contractor 'who contracts to provide services impliedly agrees to perform in a diligent and workmanlike manner.'" N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d at 67. An express warranty is therefore not required "'to bind the ship repairer to use the degree of diligence, attention and skill adequate to complete the task.'" N. Ins. Co. of New York v. Point Judith Marina, LLC, 579 F.3d at 67. Where "a shipyard represents itself as being 'a competent shipyard skilled in doing the type of work requested by the shipowner,' then the latter has 'a right to rely on the shipyard's expertise' and may 'expect a stable seaworthy vessel

28

upon completion of the repairs, regardless of the condition of
the boat prior to repairs.'" <u>Fairest-Knight</u>, 652 F.3d at 100
(brackets omitted).  Here, viewing the facts in Parry's favor, 3A
Marine held itself out to be a competent repairer of recreation
vessels and Volvo Penta engines.  This principle, however, does
not mean that "once a shipyard has undertaken to repair a boat,
any subsequent breakdowns or problems may, without more, be
presumed to have been caused by the shipyard." <u>Id.</u>

      Thus, in order to prevail on a claim for breach of the
implied warranty of workmanlike performance or breach of a
maritime repair contract, "the vessel owner must prove that any
breach of the warranty was *the proximate cause* of any actual
damages." <u>FSS, Inc. v. W-Class Yacht Co., LLC</u>, Docket No.
E1:16-CV-300-GZS, 2018 WL 953337, at *14 (D. Me. Feb. 20, 2018)
(citing <u>Fairest-Knight</u>, 652 F.3d at 99).  3A Marine serviced the
vessel for a seven-year period before the incident.  The spring
commissioning for the 2014 season included running and testing
the engine systems.  (Docket Entry # 19-1, Ex. 8, p. 25).  When
Parry noticed and reported a gasoline odor to Desmond in early
July and on July 25, 2014, Desmond undertook an inspection of the
engine on each occasion.  A reasonable jury could therefore find
that the scope of the work, whether via an express contract or an
implied warranty, extended to the engine fuel line.  <u>See</u>
<u>generally</u> <u>N. Ins. Co. of New York v. Point Judith Marina, LLC</u>,

579 F.3d at 68-69.  Parry had a right to rely on 3A Marine's expertise and to expect a seaworthy vessel when Desmond completed the service and/or repair and returned the vessel.

As previously discussed, however, 3A Marine did not have exclusive control of the vessel such that a presumption of causation could arise.  Having considered Parry's arguments to the contrary and for reasons stated in Roman numeral I, a reasonable jury could not find by a preponderance of the evidence that the actions or omissions of 3A Marine in servicing or repairing the vessel in July 2014 (or prior thereto) proximately caused the injury or damages to the vessel on August 24, 2014.[21] Although 3A Marine seeks summary judgment on "all [c]ounts" (Docket Entry # 117) in the amended third-party complaint, it presents no specific argument regarding the indemnity and contribution counts.  Counts IV and V therefore remain in the amended third-party complaint at this juncture.

## CONCLUSION

In accordance with the foregoing discussion, this court

---

[21]  It is therefore not necessary to address 3A Marine's alternative arguments in support of summary judgment.  Parry did not adequately develop and therefore waived his brevis argument that, "3A Marine's motion is untimely as Plaintiff's right to limit his liability by statute must be determined first" (Docket Entry # 123, p. 2).  See Vallejo v. Santini-Padilla, 607 F.3d 1, 7, n.4 (1st Cir. 2010); Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010).

**RECOMMENDS**[22] that 3A Marine's summary judgment motion (Docket Entry # 117) be **ALLOWED** to the extent that counts I, II, III and VI are dismissed and **DENIED** without prejudice as to counts IV and V.

          /s/ Marianne B. Bowler
          **MARIANNE B. BOWLER**
          United States Magistrate Judge

---

    [22] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection should be included.  <u>See</u> Fed. R. Civ. P. 72(b).  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.